**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

DESA EMANUEL and LACRENA TAYLOR

Plaintiffs,

- against -

GAP, INC., BANANA REPUBLIC, LLC, as well as
MICHELLE RUSSO, TONI LYNN BOROWSKI and
GREGOIRE JEAN-LOUIS, *Individually*,

Defendants.

-------------------------------------------------------------------X

Case No.

**COMPLAINT**

**PLAINTIFFS DEMAND**
**A TRIAL BY JURY**

Plaintiffs, DESA EMANUEL and LACRENA TAYLOR by their attorneys, PHILLIPS &

ASSOCIATES, Attorneys at Law, PLLC, hereby complain of Defendants, upon personal

knowledge, as well as information and belief, by alleging and averring as follows:

## NATURE OF THE CASE

1.  This is the case of Banana Republic, the company, summarily firing two good employees

    for complaining against race discrimination and, in so doing, behaving like an eponymous

    dictatorship that punishes innocent people striving to protect their civil rights.

2.  Plaintiffs bring this action alleging that Defendants have violated Title VII of the Civil

    Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e, *et seq*. (amended in 1972, 1978 and

    by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"); the New York State

    Human Rights Law, New York State Executive Law, §§ 296, *et seq.* ("NYSHRL"); and

    the common law.

3.  Plaintiffs seek damages, as well as injunctive and declaratory relief, to redress the injuries

    they have suffered – physical, emotional and pecuniary -- as a result of being

discriminated and retaliated against by their employer on the basis of their race (African American), national origin (African), and color (black), which – for each of them -- ultimately resulted in the unlawful termination of their employment solely due to their constituency in the foregoing protected category.

**JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES**

4.   Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

5.   The Court has supplemental jurisdiction over the claims of Plaintiffs brought under state law pursuant to 28 U.S.C. § 1367.

6.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more Defendants reside within the Southern District of New York or the acts complained of occurred therein.

7.   Plaintiffs are properly joined in this action pursuant to Fed. R. Civ. P. 20(a)(1) as question of law and fact common to each arise in this action.

8.   By each Plaintiff (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 5, 2019; (b) receiving a Notice of Right to Sue from the EEOC on March 15, 2019; and (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, each Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as Exhibit A.

## THE PARTIES

9.      At all times relevant hereto, Plaintiff DESA EMANUEL ("EMANUEL") is a resident of the State of New York and County of Westchester.

10.     At all times relevant hereto, Plaintiff LACRENA TAYLOR ("TAYLOR") is a resident of the State and County of New York.

11.     Plaintiff EMANUEL and Plaintiff TAYLOR are collectively referred to herein as "Plaintiffs."

12.     Both Plaintiffs are African American.

13.     At all times relevant hereto, Defendant GAP, INC., ("GAP") was and is a domestic for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of New York. Defendant GAP is headquartered in Two Folsom, San Francisco, CA, 94105, but also maintains a principal place of business located at 55 Thomas Street, New York, New York, 10013.

14.     At all times relevant hereto, Defendant BANANA REPUBLIC, LLC, ("BANANA REPUBLIC") was and is a domestic for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of New York. Defendant BANANA REPUBLIC is headquartered in Two Folsom, San Francisco, CA, 94105, but also maintains a principal place of business located at 675 Avenue of the Americas, New York, New York, 10011.

15.     Upon information and belief, Defendant GAP employs over 200 individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiffs are proceeding herein.

16.     Upon information and belief, Defendant BANANA REPUBLIC employs over 200

individuals on a full-time or full-time equivalent basis and thus is subject to all statutes upon which Plaintiffs are proceeding herein.

17.     At all times relevant hereto, Plaintiffs were employees of Defendant GAP and/or Defendant BANANA REPUBLIC.

18.     Upon information and belief, at times relevant hereto, Defendant MICHELLE RUSSO ("RUSSO") was and is an individual residing in the State of New York, as well as an employee of Defendant GAP and/or Defendant BANANA REPUBLIC, holding the position of "District Manager"; and, as such, had the authority to hire, terminate, and affect the terms and conditions of Plaintiffs' employment or to otherwise influence the decision making regarding same.

19.     Upon information and belief, at all times relevant hereto, Defendant TONI LYNN BOROWSKI ("BOROWSKI") was and is an individual residing in the State of New York, as well as an employee of Defendant GAP and/or Defendant BANANA REPUBLIC, holding the position of "Regional Human Resources Manager"; and, as such, had the authority to hire, terminate, and affect the terms and conditions of Plaintiffs' employment or to otherwise influence the decision making regarding same.

20.     Upon information and belief, at all times relevant hereto, Defendant GREGOIRE JEAN-LOUIS ("JEAN-LOUIS") was and is an individual residing in the State of New York, as well as an employee of Defendant GAP and/or Defendant BANANA REPUBLIC, holding the position of "Regional Loss Prevention Manager"; and, as such, had the authority to hire, terminate, and affect the terms and conditions of Plaintiffs' employment or to otherwise influence the decision making regarding same.

21.     Upon information and belief, Defendant RUSSO and Defendant BOROWSKI are each

4

Caucasian.

22.     Upon information and belief, Defendant JEAN-LOUIS is of Haitian descent/national origin.

23.     Defendant GAP, Defendant BANANA REPUBLIC, Defendant RUSSO, Defendant BAROWSKI, and Defendant JEAN-LOUIS are sometimes collectively referred to herein as "Defendants."

### FACTS MATERIAL TO PLAINTIFF EMANUEL

24.     On or about March 25, 2009, Plaintiff EMANUEL was hired as a General Manager by Defendant GAP and/or Defendant BANANA REPUBLIC.

25.     Specifically, Plaintiff EMANUEL was hired by Valarie Rio, District Manager, to be the General Manager of the Banana Republic Store located in Scarsdale, New York.
        Plaintiff EMANUEL worked for Ms. Rio for over five years, receiving annual performance reviews of either "meets" or "exceeds" company expectations.

26.     In or about August of 2015, Plaintiff EMANUEL was promoted by Ms. Rio to be the General Manager of a larger volume Banana Republic Store located in The Westchester Mall in White Plains, New York.

27.     Plaintiff EMANUEL worked under Ms. Rio at the Banana Republic Store located in The Westchester Mall for approximately one year until June of 2016 when she was notified that the store district she worked in was being realigned and that she would no longer report to Ms. Rio.

28.     In or about September of 2016, Plaintiff EMANUEL was introduced to her new District Manager, Jill Matejunas with whom she worked for over a year, during which time she was transferred to the Banana Republic Store located in Vernon Hill, New York.

29.     In or about January of 2018, Ms. Matejunas notified Plaintiff EMANUEL that the store districts were being realigned once again and that she would now report to Defendant RUSSO, her new District Manager.

30.     In or about August of 2017, Plaintiff EMANUEL was transferred back to the Banana Republic Store located in Scarsdale, New York.

31.     In or about February of 2018, Defendant RUSSO visited Plaintiff EMANUEL at the Scarsdale Banana Republic Store on two occasions to acquaint herself with Plaintiff EMANUEL and her sales team.  During these two visits, one of which included the new Regional Manager, Cheri Schmitt, Defendant RUSSO gave Plaintiff EMANUEL very positive feedback on the general operations of the store, including a KPI (key performance indicator) ranking that was among the top three in that store district and a sales increase of approximately 12%.

32.     When Plaintiff EMANUEL was terminated on March 28, 2018, she was earning an annual salary of approximately $90,000.

## FACTS MATERIAL TO PLAINTIFF TAYLOR

33.     In or about June of 2017, Plaintiff TAYLOR was hired by Defendant GAP and/or Defendant BANANA REPUBLIC as the Associate Store Manager for the Banana Republic Store located in Vernon Hills, New York.

34.     In or about November of 2017, Plaintiff TAYLOR was promoted to the position of General Manager of the Banana Republic Store located at The Westchester Mall.

35.     In or about January of 2018, due to a realignment of store districts, Plaintiff TAYLOR began to report to Defendant RUSSO, who had been named the new District Manager.

36.     On or about February 14, 2018, Plaintiff TAYLOR met with Defendant RUSSO and

Defendant JEAN-LOUIS in person for the first time.  At this meeting, which occurred because of a conference call the three of them participated in while sitting in Plaintiff TAYLOR's office, Defendant RUSSO mispronounced Plaintiff TAYLOR's first name when she introduced the three of them on the conference call and immediately thereafter stated to all on the call that Plaintiff TAYLOR's first name was "special," and she would need to work on saying "that one" correctly.  Whereupon Defendant RUSSO and Defendant JEAN-LOUIS laughed audibly on the call.

37.   When this caused Plaintiff TAYLOR to express her displeasure through her facial expressions, Defendant RUSSO replied, again on the call for all to hear, "it ok, listen I recently did an ancestry DNA test and it showed my father has African DNA, so I do as well."

38.   A few weeks later, still some time in February of 2018, Defendant RUSSO called to speak to Plaintiff TAYLOR and again mispronounced her name, which led Plaintiff TAYLOR's associate to correct her and Defendant RUSSO to respond, while laughing, "OMG I miss pronounced your name again sometimes I get it and sometimes I don't, you know that name is special."

39.   Plaintiff TAYLOR was earning an annual salary of approximately $76,000 when she was terminated on March 27, 2018.

## FACTS MATERIAL TO BOTH PLAINTIFFS

**The Destiny Tompkins Racist "Braids" Incident at the Banana Republic Store Located in The Westchester Mall**

40. In or about September of 2017, Destiny Tompkins, a former employee of Defendant GAP and/or Defendant BANANA REPUBLIC who worked in The Westchester Mall, sued her former employer in New York State Supreme Court for race-based discrimination and retaliation alleging that a Caucasian General Manager named Michael Gennis, with the support of Ms. Matejunas, who is also Caucasian and a District Manager, ordered her to remove her hair braids while in the workplace because they were "too urban" and "unkempt" and refused to re-employ her unless she so complied.

41. Upon information and belief, Mr. Gennis was subsequently fired by Defendant GAP and/or Defendant BANANA REPUBLIC some weeks later.

42. In or about November of 2017, Plaintiff TAYLOR was promoted and transferred to the Banana Republic Store at The Westchester Mall, to fill the General Manager position recently vacated by Mr. Gennis.

43. Upon information and belief, the aforementioned civil action by Ms. Tompkins, which is still ongoing, quickly became quite notorious among all employees of Defendant GAP and/or Defendant BANANA REPUBLIC but especially African American employees.

44. Indeed, from in or about late August of 2017, through in or about September of 2017, Plaintiff EMANUEL was one of three African American managers or supervisors at

surrounding stores who was asked by Ms. Matejunas to "support" the Banana Republic Store at The Westchester Mall by providing intensive leadership coverage and performing daily operational routines, as well as hiring new sales associates and conducting weekly review of associate schedules.

45. Upon information and belief, this was done to emphasize the number of African American employees at the troubled location in order to quell public outrage about the incident involving Ms. Tompkins.

46. Defendant BAROWSKI was also involved in this effort.

47. Upon information and belief, the other two similarly situated African American managers or supervisors were Plaintiff TAYLOR and Monica Crawford.

**Incidents of Racial Harassment by Defendant RUSSO Against Both Plaintiffs at the National Brands Conference, March 5-11, 2018**

48. On March 5, 2018, while away at the "National Brand Conference" for Defendant GAP and/or Defendant BANANA REPUBLIC in Orlando, Florida, Plaintiffs and Defendant RUSSO all attended a panel discussion on "diversity and inclusion issues" at the company.

49. During that panel discussion, the Senior Vice President of Global Specialty Stores and Operations of Defendant BANANA REPUBLIC, Steve Peters, cited what had happened to Ms. Tompkins at the Banana Republic at The Westchester Mall -- which Plaintiff TAYLOR took over after Mr. Gennis was fired -- as an example of what "could never happen again to another person of color in our stores."

50. Mr. Peters further acknowledged that Defendant GAP and/or Defendant BANANA REPUBLIC had much to learn about diversity, inclusion and accepting individual differences.  Mr. Peters elaborated that Defendant GAP and/or Defendant BANANA REPUBLIC needed to shed preconceptions and stereotypes that customers or employees should look, sound and dress the "Banana Republic way."

51. Mr. Peters' speech was emotional and inspirational for Plaintiffs, bringing each of them to tears.  Upon information and belief, Defendant RUSSO witnessed Plaintiffs' emotional reaction to Mr. Peters' words.

52. Upon information and belief, the diversity and inclusion panel concluded at approximately 10:00 a.m. and for the remainder of the day Defendant RUSSO, in everyone's presence, repeatedly referred to Plaintiff TAYLOR, as "Lacrena from the Westchester" in a mocking tone as if it was a rap song.

53. Later that day, when Plaintiff TAYLOR sat down for lunch in a group including Defendant RUSSO, the latter repeated the offensive phrase to the group.

54. Thereafter, as Plaintiffs and other conference attendees moved in and out of various sessions, every time Defendant RUSSO encountered Plaintiff TAYLOR, she would repeat the offensive phrase loudly for all to hear.

55. That evening, while walking to dinner outside the hotel in downtown Orlando, Florida, Defendant RUSSO encountered Plaintiffs and again addressed Plaintiff TAYLOR by inquiring superciliously: "Is that Lacrena from the Westchester."

56. At this point, having witnessed Plaintiff TAYLOR's previous distress, Plaintiff EMANUEL intervened and respectfully admonished Defendant RUSSO that what had happened to Ms. Tompkins at The Westchester Mall was not a joke and that, as was evident from the strong

reaction to Mr. Peter's remarks "every African American employee was affected deeply by what had happened."

57. Specifically, Plaintiff EMANUEL said to Defendant RUSSO: "what happened in that store had a big impact on people I know and have worked with for two years and it was not a joking matter."

58. Indeed, Plaintiffs were especially close to the fallout from the racist incident involving Ms. Tompkins because they each participated in the rehabilitation efforts undertaken by Defendant GAP and/or Defendant BANANA REPUBLIC in the immediate aftermath.

59. Yet Plaintiff EMANUEL's earnest remonstration with Defendant RUSSO to protect her friend and colleague Plaintiff TAYLOR, only seemed to intensify Defendant RUSSO'S callous cruelty.

60. At the end of that evening, as Plaintiffs, along with another  African American General Manager, Jasmine Roache, were sitting on the hotel charter bus that was returning conference attendees back to the hotel, Defendant RUSSO entered the bus and soon thereafter dared one of her cohorts – all of whom were Caucasian -- to pick up the bus microphone and call out "where is Lacrena from the Westchester" and another person among their group stated, "I'm sure glad I'm not that GM."

61. None of them did so but the embracement and humiliation experienced by Plaintiffs was nevertheless tremendous, each of them feeling powerless to do or say anything because Defendant RUSSO was their boss.

62. The next day before dinner, Defendant RUSSO asked all of the general managers from her store district to take a picture with her, and so Plaintiffs and their colleagues did so. Thereafter, during dinner, Defendant RUSSO stated to everyone at the table "my cousin just

'liked' our group picture that I posted on Facebook and commented that Lacrena looks like Michelle Obama."

63. Mostly everyone at the table was Caucasian and laughed; conversely, Plaintiffs – who, along with Ms. Roache, were the only African Americans at the table – were mortified.

64. Plaintiff TAYLOR then excused herself from the table and went to the ladies' room, where she broke down in tears.

### Defendant BAROWSKI Interrogates Each Plaintiff on March 12, 2018

65. On March 12, 2018, at approximately 1:00 p.m., Plaintiff EMANUEL receive a call from Defendant BOROWSKI, who asked if Plaintiff EMANUEL could speak privately.

66. Plaintiff EMANUEL and Defendant BOROWSKI then had a lengthy discussion about what had happened in Orlando, Florida.

67. Defendant BOROWSKI informed Plaintiff EMANUEL that she had received a call from another general manager that something inappropriate had happened at the National Brand Conference in Orlando, Florida.

68. Defendant BOROWSKI then asked Plaintiff EMANUEL directly if she had any personal knowledge of what had happened in Orlando, Florida.

69. Plaintiff EMANUEL responded by recounting the foregoing events and observing that it seemed, perhaps, that Defendant RUSSO had been inebriated.

70. To which Defendant BOROWSKI replied, that was no excuse for inappropriate comments or conduct, for which Defendant GAP and/or Defendant BANANA REPUBLIC have zero tolerance.

71. Finally, Defendant BOROWSKI assured Plaintiff EMANUEL that: (a) the complaints made would be taken very seriously, (b) she would continue her investigation of the recent

incidents in Orlando, Florida, (c) at the conclusion of the investigation, Defendant RUSSO would be notified of the complaints made against her and be given a fair opportunity to address them, and (d) if Defendant RUSSO tried to retaliate against Plaintiff EMANUEL, in anyway, she should contact human resources.

72. Later that same day, Plaintiff TAYLOR also received a call from Defendant BOROWSKI after returning from the conference.

73. Defendant BOROWSKI stated to Plaintiff TAYLOR that she had received a call from someone she could not name, and that she had learned that something inappropriate may have happened at the National Branding Conference, which involved Plaintiff TAYLOR.

74. Plaintiff TAYLOR then conveyed to Defendant BOROWSKI in vivid detail all of the incidents of racial harassment she had suffered from Defendant RUSSO in Orlando, Florida.

75. While Defendant BOROWSKI admitted to Plaintiff TAYLOR that Defendant RUSSO'S behavior towards her during the conference was wrong, she also attempted to minimize and excuse Defendant RUSSO'S conduct as part of her "jokey personality" and meaning no harm.

76. Then Defendant BOROWSKI asked Plaintiff TAYLOR if there were any other witnesses to what happened, and Plaintiff TAYLOR told her that practically everyone in their group had witnessed some part of Defendant RUSSO'S campaign of racial harassment against her.

77. When Defendant BOROWSKI asked Plaintiff TAYLOR if she knew of anyone who would corroborate what had occurred, she gave her the names of Plaintiff EMANUEL and Ms. Roache, the only other two African American attendees.

78. Defendant BOROWSKI then stated that she would speak to Defendant RUSSO about the results of her investigation and Plaintiff TAYLOR expressed concern that she and her peers would be subjected to retaliation Defendant RUSSO.

79. Defendant BOROWSKI responded by giving Plaintiff TAYLOR the same assurance that she had given to Plaintiff EMANUEL – i.e., that there would be no form of retaliation against her or her peers for what they reported to human resources.

80. As subsequent events clearly demonstrate, nothing could have been further from the truth.

**Unlawful Termination of Plaintiff TAYLOR on March 27, 2018**

81. On March 27, 2018, Defendants RUSSO and JEAN-LOUIS arrived at Plaintiff TAYLOR's store unannounced and immediately started to speak to Melissa Kolibebek, Assistant Manager, who is Caucasian, blatantly ignoring Plaintiff TAYLOR.

82. Defendants RUSSO informed Ms. Kolibebek that Defendant JEAN-LOUIS would like to question all of the managers working that day and that he would start with her.

83. Subsequently, Defendants RUSSO ordered Plaintiff TAYLOR to go into the private office in the back of the store and speak to Defendant JEAN-LOUIS and Plaintiff TAYLOR complied.

84. In that meeting with Defendant JEAN-LOUIS and one other loss prevention specialist who was unknown to Plaintiff TAYLOR, she was asked to explain why she had edited employee time cards and she explained that she had been trained that a time card could be edited, within a three-minute margin, to correct inadvertent errors.

85. Defendant JEAN-LOUIS responded to Plaintiff TAYLOR that he had uncovered a timecard edit of hers from December of 2017 that was seven minutes in length and Plaintiff TAYLOR explained that sometimes employees would clock in early, so as not to forget to punch in, but stay in the break area talking to their peers. Whenever Plaintiff TAYLOR would discover

this practice, she would put the person on notice that their time would be corrected in the system.

86. In this conversation, Defendant JEAN-LOUIS kept insisting that Plaintiff TAYLOR needed to admit that she fraudulently docked workers for work actually performed in order to avoid points off of her audit score, but Plaintiff TAYLOR steadfastly refused.

87. At that point, Defendant JEAN-LOUIS asked Plaintiff TAYLOR to leave the office while he touched base with Defendants RUSSO and, upon information and belief, Defendant BAROWSKI.

88. Approximately thirty minutes later, Defendant JEAN-LOUIS summoned Plaintiff TAYLOR back into the private office to speak with Defendant RUSSO.

89. At that point, Defendant RUSSO notified Plaintiff TAYLOR that she was being terminated from her position, effective immediately, because their investigation had established that she had mis-edited up to six hours of employee time.

90. Thus, Defendant RUSSO summarily dismissed Plaintiff TAYLOR and ordered her off the premises.

91. Upon information and belief, at some point during March 27th, 2018, but before Plaintiff TAYLOR departed her store, Defendants RUSSO and JEAN-LOUIS questioned Ms. Kolibebek about Plaintiff TAYLOR and Ms. Kolibebek vehemently defended the propriety of Ms. TAYLOR's conduct, even admitting that she too had "edited" timesheets on occasion as Defendant Taylor had been accused of doing.

92. Upon information and belief, upon learning of Ms. Kolibebek's admission in this regard, Defendants RUSSO and JEAN-LOUIS informed her that they would "have to give … [her] a slap on the wrist" but she would not be terminated like Plaintiff TAYLOR.

93. Upon information and belief, disgusted with the hypocrisy of Defendant GAP and/or Defendant BANANA REPUBLIC, Ms. Kolibebek voluntarily resigned her position approximately two months after Plaintiff TAYLOR was terminated.

94. The next day, Plaintiff TAYLOR left a voicemail for Defendant BAROWSKI explaining that she believed she had been unlawfully terminated in retaliation for the complaint of discrimination she had lodged against Defendant RUSSO.

95. The following day, Plaintiff TAYLOR spoke with Defendant BAROWSKI and walked her through why she believed Defendant RUSSO discrimination against her because of her race and then retaliated against her when she found out that Plaintiff TAYLOR had spoken up about Defendant RUSSO'S behavior in Orlando, Florida.

96. Defendant BAROWSKI assured Plaintiff TAYLOR that she would take a few days to investigate her claim and get back to her.

97. About two weeks later, during the second week in April, Plaintiff TAYLOR received a call back from Defendant BAROWSKI, who reported her findings that whatever happened in Orlando, Florida, had nothing to do with her termination because the investigation into the timecard issue predated the Orlando, Florida, conference by approximately one month.

98. Defendant BARIOWSKI, however, offered no evidence to back up this convenient assertion.

99. Upon information and belief, thereafter, sometime later in April of 2018, Defendant RUSSO told a former colleague of Plaintiff TAYLOR's, Ms. Roache, who remained a general manager at Defendant GAP and/or Defendant BANANA REPUBLIC, that Plaintiff TAYLOR had been was terminated for "doing some very dishonest things."

**Unlawful Termination of Plaintiff EMANUEL on March 28, 2018**

100.    The morning after he had participated in the termination of Plaintiff TAYLOR, on March

28, 2018, at or about 11:00 a.m., Defendant JEAN-LOUIS showed up at Plaintiff EMANUEL's store, again, unannounced and, again, with an unidentified colleague from another store district.

101. When Plaintiff EMANUEL welcomed them both and asked what the purpose of their visit was, she was told they would be "conducting interviews" – nothing more.

102. Because her store was a "high shrink location" -- i.e., a store that traditionally experienced a high rate of merchandise loss – she thought it was business as usual.

103. Defendant JEAN-LOUIS first interviewed Catherine Rosenthal, Assistant Manager, in the back private office; approximately an hour later, Defendant JEAN-LOUIS summoned Ms. Crawford, a Store Supervisor.

104. When Ms. Rosenthal and Ms. Crawford each returned from their respective interviews with Defendant JEAN-LOUIS they were very emotional and upset.

105. At approximately 1:00 p.m., Defendant RUSSO arrived at Plaintiff EMANUEL's store, again, unscheduled and unannounced.

106. Defendant RUSSO immediately asked where Defendant JEAN-LOUIS was and Plaintiff EMANUEL directed her to the back private office.

107. Approximately an hour later, Defendant RUSSO summoned Plaintiff EMANUEL to the private office and informed her that Defendant JEAN-LOUIS and his unidentified colleague needed to question her.

108. The unidentified examiner began to grill Plaintiff EMANUEL about her knowledge of the time and attendance policies of Defendant GAP and/or Defendant BANANA REPUBLIC; Defendant JEAN-LOUIS was taking copious notes while Plaintiff EMANUEL was being interrogated.

109.  This interrogation lasted approximately ninety minutes and at some point well into the questioning, Plaintiff EMANUEL asked what all this was about and was told that "a regional investigation was being conducted around time and attendance editing to determine if a re-educate campaign was required."

110.  Defendant JEAN-LOUIS then took out his tablet and showed Plaintiff EMANUEL certain timekeeping records bearing her employee identification number that indicated she had made twelve timesheet adjustments within an eight-month period.

111.  Plaintiff EMANUEL responded to Defendant JEAN-LOUIS that she had no idea what he was talking about but that managers routinely adjusted worker timesheets for appropriate reasons.

112.  Defendant JEAN-LOUIS kept insisting to Plaintiff EMANUEL that she had violated company policy and had made "unauthorized adjustments" and Plaintiff EMANUEL kept denying his accusations.

113.  As Defendant JEAN-LOUIS kept asking Plaintiff EMANUEL the same questions over and over again and getting the same clear proclamation of innocence from her, he became irate and unhinged, at one point calling her a "liar who knew exactly what she was doing" in the presence of his unidentified colleague.

114.  Towards the end of the interrogation, Plaintiff EMANUEL asked Defendant JEAN-LOUIS if she could provide a written statement of her position to include in his report and he said yes but then attempted to coach her on what to write about the discussion they had just had.

115.  Defendant JEAN-LOUIS told Plaintiff EMANUEL she could do so at a later time and should return to work immediately.

116.   Later in the day Plaintiff EMANUEL was given a blank statement sheet by the unnamed partner of Defendant JEAN-LOUIS, on which Plaintiff EMANUEL wrote that she had been accused of unauthorized time sheet adjustments, that she had no knowledge of what specifically she was alleged to have done, and that, to the best of her knowledge, she had never violated any company policy.

117.   The statement sheet was taken from Plaintiff EMANUEL by the unnamed partner of Defendant JEAN-LOUIS, and Plaintiff EMANUEL was never given a copy of her written statement.

118.   After approximately another two hours, during which time Defendants RUSSO and JEAN-LOUIS were mostly huddled in the private office at the back of the store along with their unnamed colleague, Defendant JEAN LOUIS appeared and Plaintiff EMANUEL asked him if she could leave because it was now after 5:00 p.m. and she needed to leave to pick up her kids from afterschool care.

119.   Defendants JEAN-LOUIS indicated that they would speak to her soon and a few minutes later Defendant RUSSO summoned Plaintiff EMANUEL into the private office and told her "based on the evidence that was provided by the loss prevention team she was being terminated for serious violation of the company's time sheet adjustment policy" and, Defendant RUSSO added, because Plaintiff EMANUEL  was a general manager she was "being held to a higher standard," which she had "failed to meet."

120.   Whereupon, Defendant RUSSO abruptly asked Plaintiff EMANUEL for her keys and thrust an unemployment form into her hands stating ominously that "the company typically does not share reasons for termination with other potential employers."

121.   Plaintiff EMANUEL walked out of her store for the last time utterly shocked and

dismayed at what had just happened.

**Damages Caused by Defendants' Unlawful Retaliation Scheme**

122.    Upon information and belief, the job performance of each Plaintiff was above average during the course of their respective employment with Defendant GAP and/or Defendant BANANA REPUBLIC.

123.    Upon information and belief, the unidentified loss prevention specialist who partnered with Defendant JEAN-LOUIS in both the March 27th termination of Plaintiff TAYLOR and the March 28th termination of Plaintiff EMANUEL was one and the same person – Terry Riley.

124.    Upon information and belief, Defendant RUSSO and Defendant JEAN-LOUIS have been close personal friends for many years, with the former recommending the latter for his current position with Defendant GAP and/or Defendant BANANA REPUBLIC, and the latter attending the former's wedding in or about 2017.

125.    Upon information and belief, Defendants' unlawfully disparate treatment of Plaintiffs was flagrant, notorious, and recklessly indifferent towards any norm of fairness to which Plaintiffs are entitled, if not intentionally disregarding of same.

126.    Upon information and belief, Defendants terminated Plaintiffs' employment solely because of Plaintiffs' race (African American), national origin (African), and color (black); therefore, any other reason supplied by Defendants was and is merely pretextual.

127.    But for the facts stated herein, Defendants would not have terminated Plaintiffs' employment.

128.    Plaintiffs each feel offended, disturbed, and humiliated by the blatantly unlawful and suspiciously similar discriminatory and retaliatory termination they each suffered at the

hands of Defendants.

129. Defendants' cynical manipulation of the truth for the sole purpose of establishing a pernicious racist stereotype – the thieving African American – and doing so with the aid of a token person of color in order to form a pretextual basis to terminate each Plaintiff, is beyond the pale of any measure of decency corporate or personal.

130. Plaintiffs have been unlawfully discriminated and retaliated against, humiliated, and degraded, and as a result, suffered loss of rights, emotional distress, loss of income and earnings.

131. Defendants' actions and conduct were intentional for the purpose of harming each Plaintiff.

132. As a result of Defendants' actions, each Plaintiff feels extremely degraded, victimized, embarrassed, and emotionally distressed.

133. As a result of the acts and conduct complained of herein, each Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and each Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Each Plaintiff further experienced severe emotional and physical distress.

134. As a result of the above, each Plaintiff has been damaged in an amount in excess of the jurisdiction of the Court.

135. Because Defendants' conduct has been malicious, willful, outrageous, and done with full knowledge of the legion of law to the contrary, Plaintiffs demand punitive damages as against all Defendants, jointly and severally.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION AND RETALIATION UNDER TITLE VII
### <u>(Not Against Individual Defendants)</u>

136. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

137. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, for relief based upon the unlawful employment practices of the above-named Defendant GAP and Defendant BANANA REPUBLIC. Plaintiffs complain that Defendant GAP and/or Defendant BANANA REPUBLIC each violated Title VII's prohibition against discrimination or retaliation in employment based, in whole or in part, upon an employee's race (African American), national origin (African), and color (black).

138. Defendant GAP and Defendant BANANA REPUBLIC engaged in unlawful employment practices prohibited by 42 U.S.C. §§ 2000e, *et seq.*, by discriminating and retaliating against Plaintiffs because of their race (African American), national origin (African), and color (black).

139. As a result of the acts and conduct complained of herein, Plaintiffs have each suffered and will each continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that their employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

140. Accordingly, as a result of the unlawful conduct of Defendant GAP and/or Defendant BANANA REPUBLIC, Plaintiffs have each been damaged as set forth herein and each is

entitled to the maximum compensation available to each of them under this law.

### AS A SECOND CAUSE OF ACTION FOR DISCRIMINATION AND RETALIATION UNDER THE NEW YORK STATE LAW <u>(Against All Defendants)</u>

141.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of

this complaint as if fully set forth herein.

142.    Executive Law § 296 provides that:

> 1.   It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

143.    Defendants engaged in an unlawful discriminatory practice by discriminating against the

Plaintiffs because of their race (African American), national origin (African), and color

(black).

144.    As a result of the acts and conduct complained of herein, Plaintiffs each have suffered and

will each continue to suffer damages including but not limited to economic and pecuniary

losses (past and future) – such as income, salary, benefits, bonuses, commission and other

compensation that their employment entailed; severe emotional, psychological and

physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures;

and other non-pecuniary losses and special damages.

145. Accordingly, as a result of Defendants' unlawful conduct, Plaintiffs have each been

damaged as set forth herein and each is entitled to the maximum compensation available to

each of them under this law.

## AS A THIRD CAUSE OF ACTION
## UNDER STATE LAW AIDING AND ABETTING
## (Against Individual Defendants Only)

146.    Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

147.    New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

148.    Defendants RUSSO, BAROWSKI and JEAN-LOUIS each engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct against each Plaintiff.

149.    As a result of the acts and conduct complained of herein, Plaintiffs each have suffered and will each continue to suffer damages including but not limited to economic and pecuniary losses (past and future) – such as income, salary, benefits, bonuses, commission and other compensation that their employment entailed; severe emotional, psychological and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

150.    Accordingly, as a result of the unlawful conduct of Defendants RUSSO, BAROWSKI and JEAN-LOUIS, Plaintiffs have each been damaged as set forth herein and each is entitled to the maximum compensation available to each of them under this law.

## AS A FOURTH CAUSE OF ACTION FOR DEFAMATION
## UNDER NEW YORK COMMON LAW

**(Against Defendants GAP, BANANA REPUBLIC, RUSSO and JEAN-LOUIS, Only)**

151.   Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

152.   Defendants RUSSO and JEAN-LOUIS  each directly and independently, and Defendants GAP and BANANA REPUBLIC through said agents, made false statements deliberately or with negligence about Plaintiffs, respectively, which were, in fact, made known to third parties.

153.   These false statements were made by the aforementioned Defendants without the consent of either Plaintiff.

154.   These false statements were made by the aforementioned Defendants to maliciously degrade and humiliate each Plaintiff and, therefore, are defamatory.

155. Accordingly, as a result of the unlawful conduct of Defendants GAP, BANANA REPUBLIC, RUSSO, and JEAN-LOUIS, jointly and severally, each Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this law.

## JURY DEMAND

156. Plaintiffs each requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiffs respectfully requests a judgment against the Defendants:

A.   Declaring that Defendants engaged in, and enjoining Defendants from continuing to engage in, unlawful employment practices prohibited by the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et. seq.*; and the New York State Human Rights Law, New York State Executive Law, §§ 296, *et. seq.*, in that Defendants discriminated and retaliated against each Plaintiff on the basis of her race (African

American), national origin (African), and color (black);

B.      Awarding damages to each Plaintiff for all lost wages and benefits resulting from Defendants' unlawful discrimination and retaliation and to otherwise make each of them whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding each Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven at trial;

D.      Awarding Plaintiffs punitive damages;

E.      Awarding Plaintiffs attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of this action;

F.      Awarding Plaintiffs such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices against each of them.

Dated: New York, New York
April 23, 2019

                                                    **PHILLIPS & ASSOCIATES,**
                                                    **ATTORNEYS AT LAW, PLLC**


                                    By:     _____
                                                    Parisis G. Filippatos (PF1593)
                                                    *Attorneys for Plaintiffs*
                                                    45 Broadway, Suite 620
                                                    New York, New York 10006
                                                    (212) 248-7431
                                                    PFilippatos@tpglaws.com