UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DESA EMANUEL, et al.,

                              **OPINION AND ORDER**

               Plaintiffs,

v.                             19-CV-03617 (PMH)

GAP, INC., et al.

               Defendants.
--------------------------------------------------------X
PHILIP M. HALPERN, United States District Judge:

Desa Emanuel ("Emanuel") and Lacrena Taylor ("Taylor," and with Emanuel, "Plaintiffs") bring this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., 42 U.S.C. § 1981 ("§ 1981"), and New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq*., alleging that Gap, Inc. ("Gap"), Banana Republic, LLC ("Banana Republic," and with Gap, the "Corporate Defendants"),[1] Michelle Russo ("Russo"), Gregoire Jean-Louis ("Jean-Louis"), and Toni Lynn Borowski ("Borowski," and collectively, "Defendants") unlawfully terminated Plaintiffs.

Plaintiffs filed their initial Complaint on April 23, 2019. (Doc. 1). On May 8, 2023, Plaintiffs filed their First Amended Complaint with leave of the Court. (Doc. 70, "FAC"). The FAC alleges five claims for relief against one or more Defendants: (i) discrimination and retaliation under Title VII; (ii) discrimination and retaliation under § 1981; (iii) discrimination and retaliation under NYSHRL; (iv) aiding and abetting; and (v) defamation. (Doc. 70, "FAC"). Plaintiffs withdrew the fifth claim for relief for defamation on November 30, 2022. (Doc. 176).

Defendants filed their motion for summary judgment under Federal Rule of Civil Procedure 56 on October 21, 2021. (Doc. 148). The Court denied Defendants' motion for summary

---

[1] Banana Republic is a wholly-owned subsidiary of Gap, which is a publicly held corporation. (Doc. 23).

judgment without prejudice (Doc. 169) and permitted the filing of a substitute summary judgment motion after the parties filed a compliant Rule 56.1 statement. (Doc. 172, "56.1 Stmt"; Doc. 174).

Presently pending before the Court is Defendants' December 5, 2022 renewed motion for summary judgment on all claims under Federal Rule of Civil Procedure 56, filed in accordance with the briefing schedule set by the Court. (Doc. 178; Doc. 179, "Def. Br."; Doc. 180, "Pl. Br."; Doc. 181, "Reply Br."; Doc. 183, "Filippatos Decl."; Doc. 184, "Sobocinski-Nasierowski Decl."; Doc. 185, "Jean-Louis Decl."; Doc. 186, "Russo Decl."; Doc. 187, "Borowski Decl."; Doc. 188, "Railey Decl."; Doc. 189, "Schmidt Decl."). Defendants seek summary judgment primarily because they believe that Plaintiffs cannot make out a *prima facie* case of discrimination, Plaintiffs were terminated for legitimate non-discriminatory reasons, and there was no causal connection, for retaliation purposes, between a protected activity and termination.

For the reasons set forth below, Defendants' renewed motion for summary judgment is DENIED.

## **BACKGROUND**

The facts recited below are taken from Plaintiffs' FAC, Defendants' 56.1 Statement with Plaintiffs' Responses and Counterstatement, and the admissible evidence submitted by the parties.

### I.    Plaintiffs' Employment Background

Emanuel, an African American woman, began her employment at Banana Republic in 2009 as a General Manager. (56.1 Stmt ¶ 3). Emanuel served as General Manager of the Vernon Hills Banana Republic store in Scarsdale, New York ("Vernon Hills Store") from August 2017 until her termination in March 2018. (*Id.*).

Taylor, an African American woman, was hired in June 2017 as an Associate Store Manager at the Vernon Hills Store. (*Id.* ¶ 1). On October 4, 2017, Destiny Tompkins, an African

American sales associate at the Banana Republic store at the Westchester Mall in White Plains, New York ("Westchester Store"), posted to Facebook that her manager told her that her box braids were not appropriate and too "urban" for Banana Republic's image. (*Id*. ¶ 8). Banana Republic terminated that manager on October 7, 2017. (*Id*.). Taylor was promoted to General Manger of the Westchester Store on or about October 29, 2017, and remained General Manager at that location until her March 2018 termination. (*Id*. ¶ 2).

Plaintiffs were supervised by Russo, District Manager of the Long Island/Westchester District, starting in late January 2018. (*Id*. ¶ 5).

As employees of Banana Republic, Plaintiffs are subject to the policies set out in Corporate Defendants' "Employee Policy Guide." The Employee Policy Guide includes the following timekeeping policy:

> Every non-exempt (hourly) employee must be paid for all hours worked… it is against Company policy to modify time records or fail to report hours so that an employee is not paid for all hours worked . . .Willful violation of timekeeping policies, including falsifying timecards or encouraging others to do so, may result in discipline up to and including immediate termination for all employees involved. Managers may never encourage or allow any violation of this policy.

(*Id*. ¶ 15).

Despite this policy, Taylor and Emanuel testified they understood that a "three-minute grace period" allowed them to modify an employee's time entry up to three minutes if an employee was early or late punching in or out three minutes or less. (*Id*. ¶ 20). At least two other managers at Banana Republic, and potentially more, believed that this unofficial "three-minute grace period" existed. (Doc. 191-1, "Reitman Aff." at ¶ 11; Doc. 191-2, "Kolibabek Aff." at ¶ 18; Filippatos

Decl. ¶ 2, Ex. 20)[2]. In contrast, several members of company leadership, including Borowski, Regional Human Resources Senior Manager of the Northeast Region, understood that modifying an employee's time punches is a violation of Banana Republic policy and was a terminable offense. (56.1 Stmt ¶¶ 6, 21).

II.     First Audit of the Westchester Store

Banana Republic performs store compliance audits on a regular basis. (*Id*. ¶ 22). On February 12, 2018, Deborah Sobocinski, Manager of Internal Audit, selected the Westchester Store to be audited because it was ranked number one in the district on the Store Selection Tool report and it was within commuting distance. (*Id*. ¶ 23). The Westchester Store failed the audit, including the Meal Period Compliance part of the audit because employees' breaks did not occur in the proper timeframes. (*Id*. ¶¶ 24-25). Taylor received a copy of the audit report on February 16, 2018, which stated that the Westchester Store would be re-audited in 30-60 days. (*Id*. ¶ 26).

III.     Field Leadership Conference

Banana Republic held a company Field Leadership Conference ("FLC") in Orlando, Florida in early March which included a panel on diversity and inclusion. (*Id*. ¶ 9). After the panel and FLC dinner on March 7, 2018, Borowski was informed that multiple general managers, including Taylor and Emanuel, had expressed concerns that Russo was repeatedly referring to Taylor as "the manager from The Westchester." (*Id*. ¶¶ 10-11). Taylor, Emanuel, and another General Manager, Jasmine Roache, discussed their concerns about Russo with Borowski on March 12, 2018. (*Id*. ¶ 11). Specifically, Taylor testified that she told Borowski that Russo had mockingly referred to Taylor as "Lacrena from The Westchester," commented that her cousin posted on social

---

[2] Despite thousands of pages of documentary material having been submitted in connection with this motion, Plaintiffs failed to file the Affidavits of Melissa Kolibabek and Kyle Reitman—though there were repeated references to these affidavits in the 56.1 Statement and briefs—until  August 4, 2023, in response to a Court order directing they be filed. (Docs. 190-191).

media saying that Taylor looked like Michelle Obama, mispronounced Taylor's name, and said that she could say those things because she "had African descent." (Filippatos Decl., Ex. 1 "Taylor Dep. Tr." at 167:7-189:6).

Borowski investigated their complaints and spoke with Russo's supervisor. (56.1 Stmt ¶ 13). Banana Republic concluded that Russo should have recognized the situation was bothering Taylor and should have addressed it. (*Id*. ¶ 14). On March 16, 2018, Russo was issued a Corrective Action for failing to recognize this "on notice" situation and take appropriate action. (*Id*.).

IV.    Second Audit of the Westchester Store

Sobocinski chose to re-audit the Westchester Store on March 20, 2018. (*Id*. ¶ 27). The store failed again but improved its score on Meal Period Compliance from a failing score to a passing score. (*Id*.; Schmidt Decl. ¶ 32, Ex. P at 21). Thereafter, Sobocinski ran a timecard modification report for the time period of February 18, 2018 to March 17, 2018 which showed that Taylor had made modifications to employees' timecards. (56.1 Stmt ¶¶ 28-29; Schmidt Decl. ¶ 31, Ex. O; Filippatos Decl. ¶ 2, Ex. 3 "Sobocinski Dep. Tr." at 57:21). Sobocinski contacted Russo, Jean-Louis, and Borowski to let them know that an investigation needed to take place. (56.1 Stmt ¶ 30).

V.    Investigations and Terminations of Plaintiffs

    a.   *Taylor*

Russo testified that she reached out to Borowski and Jean Schmidt regarding her involvement in the investigation in light of the company's retaliation policy and the fact that she had been issued a Corrective Action based on Taylor's complaint. (Filippatos Decl. ¶ 2, Ex. 11 "Russo Dep. Tr." at 244:19-248:22). Jean-Louis and Railey were designated to conduct the investigation into Taylor's timecard modifications, and Russo was told to be available to administer any discipline based on timecard modifications. (56.1 Stmt ¶¶ 32, 80). Sobocinski,

Railey, and Jean-Louis were not aware of any complaint made by either Plaintiff against Russo during the audit or timecard investigations. (*Id*. ¶ 63).

Sobocinski emailed a summary of her findings with respect to Taylor's timecard modifications at the Westchester Store to Jean-Louis, Borowski, and Russo on March 21, 2018. (*Id*. ¶ 33). The report showed that Taylor had made 32 edits, 20 of which resulted in a loss of pay to the employee, and that there were more modifications beyond that number. (*Id*. ¶ 34). In late March, Jean-Louis and Loss Prevention Associate, Maura Kelleher, reviewed video footage and confirmed that Taylor made the reported modifications. (*Id*. ¶¶ 37-38). Jean-Louis emailed his findings to Borowski, Russo, Schmidt, Railey, and others on March 26, 2023, reporting that Taylor had made 87 edits, which removed 16 hours and 45 minutes of employees' time. (*Id*. ¶¶ 39-40).

Railey interviewed Taylor on March 27, 2023 with Jean-Louis present. (*Id*. ¶ 42; Schmidt Dec. ¶ 45, Ex. CC). Taylor admitted in that interview to modifying timecards pursuant to the "three-minute rule" in order to be compliant with the meal/break policy. (56.1 Stmt ¶ 46). The parties dispute whether Taylor was confronted at this interview with records reflecting modifications greater than three minutes. (*Id*. ¶ 47; Schmidt Decl. ¶ 45, Ex. CC at 3; Taylor Dep. Tr. at 141:9-145:18). Although the details of the interaction are disputed, the record shows that there was at least some discussion about Taylor's level of cooperation with the investigation, and then the meeting concluded. (56.1 Stmt ¶ 48; Borowski Decl. ¶ 58; Taylor Dep. Tr. at 143:21-144:4). Russo, Railey, and Jean-Louis gathered in the office after Taylor's interview and held a disposition discussion with Borowski on speakerphone. (56.1 Stmt ¶ 43; Filippatos Decl. ¶ 2, Ex. 4 "Jean-Louis Tr." at 314:17-315:4). The decision was made that Russo and Railey would meet with Taylor again to remind her of her obligation to participate in the investigation, and, unless she provided a valid explanation for her timecard modifications, to terminate Taylor. (Borowski

6

Decl. ¶ 60; Jean-Louis Tr. at 323:23-324:4; 325:3-7). Russo terminated Taylor at a second meeting later that day. (56.1 Stmt ¶ 51; Borowski Decl. ¶ 61; Taylor Dep. Tr. at 144:22-145:18).

Railey and Jean-Louis interviewed Melissa Kolibabek, Assistant Manager at the Westchester Store on the same day as Taylor with respect to Kolibabek's own timecard modifications. (56.1 Stmt ¶ 42; Schmidt Decl. ¶ 44, Ex. BB). The parties dispute whether Kolibabek said in this interview that Taylor trained her to modify employees' time entries. (56.1 Stmt ¶ 44; Kolibabek Aff. ¶¶ 9-17; Doc. 188 "Railey Decl." ¶ 38). The parties also dispute whether Russo and Jean-Louis made Kolibabek cry at this interview with repeated questioning about Taylor's instructions to her. (56.1 Stmt ¶ 93). Thereafter, a decision was made that Kolibabek would be coached and re-trained, and Russo instructed Kolibabek to return to work. (Kolibabek Aff. ¶ 17; Schmidt Decl. ¶ 44, Ex. BB).

### b. Emanuel

On March 22, 2018, Banana Republic leadership decided to expand their investigation to the Vernon Hills Store where Taylor had previously worked. (56.1 Stmt ¶ 35). Sobocinski reviewed timecard modification reports from the Vernon Hills Store and found questionable modifications made by Emanuel and other managers. (*Id*. ¶ 36). Jean-Louis reviewed the timecard modifications at the Vernon Hills Store and found Emanuel made 12 edits which removed 39 minutes of time and that she was not the only manager at that location who made modifications to timecards. (*Id*. ¶ 53; Schmidt Decl. ¶ 46, Ex. DD). Railey and Jean-Louis interviewed several members of the management team at the Vernon Hills Store, including Emanuel, on March 28, 2018. (56.1 Stmt ¶ 54). The parties dispute exactly what Emanuel said during this interview, but Emanuel's timecard modifications were discussed. (*Id*. ¶ 58; Railey Decl. ¶ 45; Filippatos Decl. ¶ 2, Ex. 2 "Emanuel Dep. Tr." at 132:15-134:9). After Emanuel's interview, Railey and Jean-Louis,

with Russo present in the room, called Borowski on speakerphone for a disposition discussion. (56.1 Stmt ¶ 55). It was decided that Emanuel would be terminated that day, although the parties dispute whether this was Borowski's decision alone. (*Id.* ¶ 59; Schmidt Decl. ¶ 50, Ex. HH). The other members of the management team at the Vernon Hills Store were not terminated because both said they felt pressured by Emanuel to make timecard modifications. (56.1 Stmt ¶ 60).

### STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F.Supp.3d 714, 722 (S.D.N.Y. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-5486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F.Supp.3d at 722 (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her[ ] claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

"Courts have acknowledged the dangers of summary judgment in discrimination cases: 'Because direct evidence of ... discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Benson v. Fam. Dollar Stores, Inc.*, No. 12-CV-01457, 2017 WL 11576213, at *3 (N.D.N.Y. Mar. 31, 2017) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted)), *aff'd sub nom. Benson v. Fam. Dollar Operations, Inc.*, 755 F. App'x 52 (2d Cir. 2018).

## ANALYSIS

I.     Title VII, Section 1981, and NYSHRL Race Discrimination Claims

Plaintiffs assert three claims for relief sounding in discrimination on the basis of race under Title VII (against Corporate Defendants)[3], Section 1981 (against all Defendants), and NYSHRL[4] (against all Defendants). (*See generally* FAC). "Claims of discrimination under Title VII are analyzed at the summary judgment stage under the burden-shifting test announced by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Howard v. City of New York*, 302 F. Supp. 2d 256, 260 (S.D.N.Y. 2004), *aff'd*, 363 F. App'x 805 (2d Cir. 2010). Discrimination claims under NYSHRL and § 1981 are likewise analyzed under the *McDonnell* framework. *See Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, No. 21-CV-0695, 2023 WL 2691622, at *14 (S.D.N.Y. Mar. 29, 2023) (citing *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74-75 (2d Cir. 2016)). Phase one

---

[3] Plaintiffs acknowledge that no Title VII claim may be brought against the Individual Defendants. (Pl. Br. at 13, n. 7).

[4] Although not mentioned by the parties, the NYSHRL was amended, effective October 11, 2019. *See Makhsudova v. City of New York*, No. 20-CV-10728, 2022 WL 1571152, at *5 n.7 (S.D.N.Y. May 18, 2022) ("The New York State Legislature passed several amendments to the NYSHRL in June 2019, the effect of which was to render the standard for claims closer to the standard under the NYCHRL."). That amendment does not impact the Court's analysis given the NYSHRL claims for relief are based on events that occurred prior to October 2019.

of the *McDonnell Douglas* test places upon the plaintiff the burden of establishing a *prima facie* case of discrimination by alleging that: "(1) [s]he is a member of a protected class; (2) [her] job performance was satisfactory; (3) [s]he was subject to an adverse employment action; [and] (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination based on [race]." *Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802).

If the plaintiff sets forth a *prima facie* case of discrimination, "the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 397 (S.D.N.Y. 2013), *aff'd*, 586 F. App'x 739 (2d Cir. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802-03). "If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the *prima facie* case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). Although the *McDonnell Douglas* framework is employed to analyze § 1981 claims, at the third step of the analysis Plaintiffs must "prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019, 206 L.Ed.2d 356 (2020).

a. Phase One: *Prima Facie* Case

Defendants do not dispute that Plaintiffs have established the first three prongs of a *prima facie* case of race discrimination (Def. Br. at 16, n.6), and the Court therefore considers such argument waived. *See Vasquez v. New York City Dep't of Educ.*, No. 11-CV-03674, 2015 WL 3619432, at *14 (S.D.N.Y. June 10, 2015), *aff'd*, 667 F. App'x 326 (2d Cir. 2016) ("Courts

generally deem an argument waived or abandoned if a party fails to make it."). Rather, Defendants argue that Plaintiffs cannot satisfy the fourth element—*i.e.* no reasonable jury could find that Plaintiffs suffered an adverse employment action that occurred under circumstances giving rise to an inference of race discrimination. (Def. Br. at 10).

"[T]he burden on the plaintiff of presenting a *prima facie* case of discrimination under *McDonnell Douglas* is 'minimal.'" *Bailey v. Colgate-Palmolive Co.*, No. 99-CV-3228, 2003 WL 21108325, at *16 (S.D.N.Y. May 14, 2003), *aff'd*, 93 F. App'x 321 (2d Cir. 2004) (quoting *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)). Specific to the fourth element of a *prima facie* race discrimination claim, the standard is "flexible" and "can be satisfied differently in differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 329 (S.D.N.Y. 2020) ("The facts required to meet this element of the *prima facie* case will 'inevitably vary in different employment discrimination cases.'" (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001))). While the burden on a plaintiff is minimal, "purely conclusory allegations of discrimination, absent any concrete particulars," will not suffice. *Smith*, 440 F. Supp. 3d at 328 (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "Circumstances which may give rise to an inference of discrimination include 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action].'" *Id.* (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015)).

Plaintiffs argue that Defendants' "blatantly more favorable treatment" of Kolibabek, a Caucasian assistant manager at the Westchester Store gives rise to an inference of discrimination. (Pl. Br. at 19). "A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." *Abdul-Hakeem v. Parkinson*, 523 F. App'x 19, 20-21 (2d Cir. 2013) (quoting *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010)). "The 'standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,' such that 'the comparator must be similarly situated to the plaintiff in all material respects.'" *Abdul-Hakeem*, 523 F. App'x at 21 (quoting *Ruiz*, 609 F.3d at 494); *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("[T]he plaintiff must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself."). "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." *Johnson v. L'Oreal USA*, No. 21-2914-CV, 2023 WL 2637456, at *4 (2d Cir. Mar. 27, 2023) (quoting *Ruiz*, 609 F.3d at 493-94); *see also Graham*, 230 F.3d at 40.

As a threshold matter, Plaintiffs may be found similarly situated to Kolibabek despite the fact that they held different management titles if they were subject to the same workplace standards. *See i.e., Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 476 (S.D.N.Y. 2011) (finding Plaintiff made the requisite minimal showing that he and comparator were "subject to the same workplace standards" where both were senior administrators but one was ranked higher than the other in the organizational hierarchy); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 n.7 (2d Cir. 2010) ("[a]lthough an employee's position is relevant to the analysis,

employees need not be of the exact same rank to be considered similarly situated"); *see also Graham*, 230 F.3d at 40 (observing that "[w]hat constitutes 'all material respects' . . . varies somewhat from case to case," but "there should be an objectively identifiable basis for comparability").

Kolibabek had worked as an Assistant Manager at the Westchester Store for approximately four months prior to the investigations. (Kolibabek Aff. ¶ 7). Taylor had worked as an Assistant Manager for four months and a General Manager for five months prior to the investigations (56.1 Stmt ¶ 2), and Emanuel had worked as a General Manager for approximately nine years leading up to the investigations. (*Id*. ¶ 3). Even considering their differing levels of experience, the record shows that both Plaintiffs and Kolibabek were subject to the same timekeeping policy which refers only to "managers" and does not distinguish between the various levels of management. (*Id*. ¶ 15, "[w]illful violation of timekeeping policies, including falsifying timecards or encouraging others to do so, may result in discipline up to and including immediate termination for all employees involved. Managers may never encourage or allow any violation of this policy"). Therefore, a genuine issue of material fact exists as to whether, as managers, they were subject to the same disciplinary standard given that discipline for violation of Banana Republic's timekeeping policy is categorical. *See i.e., Graham*, 230 F.3d at 42 (finding a material question of fact as to whether employees were similarly situated where "[n]owhere does the policy refer to the position held by the employee. Rather, the language stipulating dismissal for a violation is categorical.")

Additionally, a jury may find that Plaintiffs and Kolibabek engaged in comparable conduct because they violated the same policy with the same misconduct—modifying employee timecards causing a loss of time to employees. Banana Republic became aware of Kolibabek's violations around the same time as it became aware of Plaintiffs' misconduct, and utilized the same

investigative team and human resources person to determine discipline. (Schmidt Decl. ¶¶ 44-45, 50, Exs. BB, CC, HH). Plaintiffs and Kolibabek explained their conduct based on the same understanding of the existence of a "three-minute grace period."  (56.1 Stmt ¶ 20; Kolibabek Aff. ¶ 18). However, only Plaintiffs were terminated.

In light of the fact that the burden of establishing a *prima facie* case is minimal and given the non-conclusory nature of the allegations, the Court finds that Plaintiffs have satisfied their phase one burden and moves to phase two of the *McDonnell Douglas* standard.

b.  Phase Two: Legitimate, Non-Discriminatory Reason

At phase two, "the burden of production [ ] shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action." *Wesley-Dickson*, 973 F. Supp. 2d at 397 (quoting *McDonnell Douglas*, 411 U.S. at 802-03). Here, Plaintiffs' terminations constitute adverse employment actions. *See Witek v. City of New York*, 807 F. App'x 52, 54 (2d Cir. 2020) ("[T]ermination certainly constitute[s an] adverse employment action[ ]"). Based on the evidence in the record, no reasonable jury could find that Defendants failed to satisfy their burden of establishing that there was a legitimate non-discriminatory reason for the adverse employment action.

It is undisputed that Plaintiffs violated company policy by modifying employees' time entries. Additionally, Banana Republic's timekeeping policy explicitly warns that a violation of the policy may lead to termination. (56.1 Stmt ¶ 15). Whether or not Plaintiffs' timecard manipulation was authorized by an unofficial three-minute policy, this misconduct remains a legitimate, non-discriminatory reason because Defendants believed it a terminable offense. (*Id.* ¶ 21); *see McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against

plaintiff. We are interested in what *motivated* the employer.") Plaintiffs' violation of Company timekeeping policy is a legitimate, non-discriminatory reason for the Company's decision to terminate them. *See Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06-CV-05474, 2008 WL 857492, at *10 (S.D.N.Y. Mar. 31, 2008) ("The decision to terminate a senior manager who fails to comply with company policy . . . is a legitimate, non-discriminatory reason for termination.").

Accordingly, Defendants offered a legitimate non-discriminatory reason for Plaintiffs' terminations.

c. Phase Three: Pretext

Phase three of the *McDonnell Douglas* burden shifting analysis requires Plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was." *Wesley-Dickson*, 973 F. Supp. 2d at 397. This requires Plaintiff to "come forward with 'sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].'" *Hartley v. Rubio*, 785 F. Supp. 2d 165, 180 (S.D.N.Y. 2011) (quoting W*einstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *see also Rajcoomar v. TJX Cos., Inc.*, 319 F. Supp. 2d 430, 438 (S.D.N.Y. 2004) ("The Supreme Court has articulated that 'a reason cannot be proved to be a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.'" (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993))).

To demonstrate pretext with respect to Plaintiffs' Title VII and NYSHRL discrimination claims, "a plaintiff must submit admissible evidence showing circumstances to permit a rational finder of fact to find that the defendant's conduct was motivated in whole or in part by discrimination." *Rajcoomar*, 319 F. Supp. 2d at 438. The admissible evidence offered by a plaintiff

must go beyond "self-serving and conclusory allegations that the defendants' proffered reasons were false." *Hartley*, 785 F. Supp. 2d at 180 (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)); *Alleyne v. Four Seasons Hotel*, No. 99-CV-03432, 2001 WL 135770, at *11 (S.D.N.Y. Feb. 15, 2001), *aff'd sub nom.* 25 F. App'x 74 (2d Cir. 2002) ("The plaintiff [ ] fails to offer any acts, statements, or admissions by a decision-maker to support her allegations of bias . . . and the plaintiff's conclusory and self-serving allegations that she was discriminated against are insufficient to demonstrate that [defendants'] nondiscriminatory reasons were a pretext for discrimination."). "Moreover, an employer's decisions are given deference by the court unless they are clearly pretextual." *Hartley*, 785 F. Supp. 2d at 180 (citing *Deabes v. Gen. Nutrition Corp.*, 415 Fed. App'x 334, 336 (2d Cir. 2011)). "A showing that similarly situated employees belonging to a different [protected class] received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for . . . discrimination." *Graham*, 230 F.3d at 43.

Plaintiffs argue that Banana Republic's disparate treatment of Kolibabek is evidence of pretext.[5] (Pl. Br. at 23-24). Defendants counter that Kolibabek is not similarly situated to Plaintiffs because she was of a different management level, had different awareness of company policies

---

[5] Plaintiffs also state in their briefing that Catherine Rosenthal, a Caucasian Assistant Manager at the Vernon Hills Store, made timecard modifications but was not terminated. (Pl. Br. at 24). Plaintiffs do not argue that Ms. Rosenthal is a comparator. (*Id.*; Reply Br. at 13, n.10). The record shows that Ms. Rosenthal was investigated for modifying her own timecards on two occasions in order to cut her own hours, and was issued a Corrective Action thereafter. (Schmidt Decl. ¶ 51, Ex. II; Filippatos Decl. ¶ 2, Ex. 22). Given Plaintiffs' lack of argument in briefing and the fact that Ms. Rosenthal's conduct did not result in the loss of employee time other than her own, the Court will not consider Ms. Rosenthal as a comparator. *Graham*, 230 F.3d at 39.

and the requirements of New York law, and had been employed for a different amount of time.[6] (Def. Br. at 23-24; Reply Br. at 11-12). The Court finds that a reasonable jury could find Plaintiffs are similarly situated to Kolibabek.

As discussed *supra*, although employees' positions in a company are "relevant to the analysis, employees need not be of the exact same rank to be considered 'similarly situated.'" *Gorzynski*, 596 F.3d 93 n.7.[7] The inquiry is focused on workplace standards. *See i.e., Senno*, 812 F. Supp. 2d at 476. Here, the evidence does not support there being a significant difference between the workplace standards for Assistant and General Managers of Banana Republic such that they could not be found similarly situated as a matter of law. Rather, the record shows that all managers were expected to abide by the same timekeeping policy which required maintenance of accurate timecards. (56.1 Stmt ¶ 15). Additionally, Sobocinski had a discussion with an Assistant Manager at the Westchester Store about New York State meal/break rules on at least one occasion, which shows that Banana Republic had at least some expectations that Assistant Managers would be aware of company policies regarding timing of breaks. (*Id*. ¶ 83). Also, despite having deposed several members of Banana Republic's leadership, Defendants do not cite to any record evidence to support their assertion that "behavioral expectations for Plaintiffs as General Managers were significantly different from the expectations for the managers who reported to them." (Def. Br. at 23). Therefore, a reasonably jury could find that Plaintiffs were held to the same workplace standards as Kolibabek with respect to timekeeping.

---

[6] Defendants also argue that, in any event, Kolibabek is not a similarly situated comparator because she was acting on instruction from Plaintiffs regarding three-minute modifications. (Def. Br. at 23). However, Kolibabek states in her affidavit that she had only ever been instructed to edit a timecard once by Katrin Elcock because Ms. Elcock had forgotten to clock out. (Kolibabek Aff. ¶ 12). Accordingly, whether Kolibabek made timecard modifications on instruction from Plaintiffs is a genuinely disputed fact.

[7] Notably, Taylor had been promoted from Assistant Manager to General Manager after only approximately four months of working at Banana Republic. (56.1 Stmt ¶¶ 1-2).

A reasonable jury could also find that Kolibabek engaged in misconduct of comparable seriousness to Plaintiffs since she committed the same violation of Banana Republic's timekeeping policy by manipulating timecards. *See Hamilton v. DeGennaro*, No. 17-CV-07170, 2019 WL 6307200, at *11 (S.D.N.Y. Nov. 25, 2019) ("For comparators to be similarly situated, a plaintiff must show those employees engaged in acts of comparable seriousness. A proposed comparator is not similarly situated unless she engaged in all of the same misconduct as plaintiff, or at least committed the most serious infractions for which the plaintiff was subjected to an adverse employment action."). Specifically, Kolibabek made 7 edits which took away 19 minutes of time, Emanuel made 12 edits which took away 39 minutes of time, and Taylor made 87 edits which took away 16 hours and 45 minutes of employees' time. (56.1 Stmt ¶¶ 40, 53; Schmidt Decl., Exs. X, DD; Borowski Decl. ¶¶ 51, 63). While the number of edits between Kolibabek and Taylor is different, their titles and level of experience are similar. Defendants argue the conduct is not of comparable seriousness because Plaintiffs removed more time than Kolibabek and made timecard modifications beyond three-minute increments. (Def. Br. 15-16; Reply Br. 12-13). There is no genuine dispute as to the fact that Plaintiffs made modifications of more than three minutes based on the timecard modification reports. (56.1 ¶ 40; Schmidt Decl. ¶¶ 31, 35, 36, Exs. O, S, T). However, even recognizing that Plaintiffs' modifications are quantitatively higher than Kolibabek's, the underlying conduct is the same and the comparative seriousness of their conduct is an issue of fact more properly suited for a jury. *Edwards v. Khalil*, No. 12-CV-08442, 2016 WL 1312149, at *17 (S.D.N.Y. Mar. 31, 2016) ("The conduct in question does not have to be identical, but it must be of comparable seriousness").

Despite having committed the same terminable violation and, upon confrontation, citing the same explanation of an unofficial three-minute rule, Kolibabek was sent back to work without

a formal reprimand while Plaintiffs were terminated. (Kolibabek Aff. ¶ 17). Accordingly, the Court finds that a reasonable jury could find Plaintiffs were similarly situated to, but treated differently than, Kolibabek.

Further, the Court finds this evidence of disparate treatment sufficient to create a triable issue of fact as to Plaintiffs' discrimination claims under § 1981 even under the heightened burden. Under § 1981, to "prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp.*, 140 S. Ct. at 1019. Plaintiffs argue that race was the but-for cause of Plaintiffs' terminations because Russo had "discriminatory motivation." (Pl. Br. 26-27). There is no dispute that Russo was disciplined for her conduct toward Taylor at the FLC, including her comments calling Taylor "the manager from The Westchester" which Plaintiffs argue is a play on the Jennifer Lopez song, "Jenny from the Block." (56.1 Stmt ¶ 14; Pl. Br. 8, n.5). Taylor contends, and Russo denies, that Russo's behavior and comments toward Taylor at the FLC was racist and derogatory. (Taylor Dep. Tr. at 163:4-8, 185:3-11, 186:8-12, 189:3-6; Russo Dep. Tr. at 95:18-25) Accordingly, these conflicting accounts of the nature of Russo's conduct that led to her receiving a Corrective Action necessitate a credibility finding best left to a jury. *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of events are matters for the jury, not for the court on summary judgment." (internal quotation marks omitted)).

Defendants' renewed motion for summary judgment dismissing Plaintiffs' discrimination claims is, accordingly, denied.

II.     Title VII, Section 1981, and NYSHRL Retaliation Claims

Plaintiffs further bring retaliation claims under Title VII (against Corporate Defendants), Section 1981(against all Defendants), and NYSHRL (against all Defendants). All three statutes are likewise analyzed under the *McDonnell Douglas* framework. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation claims under both Title VII and the NYSHRL."); *see also Littlejohn*, 795 F.3d at 315 ("Retaliation claims under Title VII and § 1981 are both analyzed pursuant to Title VII principles and the *McDonnell Douglas* burden-shifting evidentiary framework." (footnote omitted)).

To make out a *prima facie* case of retaliation, "a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. New York City Transit Auth.*, No. 22-792-CV, 2023 WL 5005655, at *5 (2d Cir. Aug. 7, 2023); *see also Rosinski v. Am. Axle & Mfg., Inc.*, 402 F. App'x 535, 537 (2d Cir. 2010).

Plaintiffs must show "that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Id.*; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90-91 (2d Cir. 2015) ("It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision."). "This but-for reason need not be the only cause for the employer's action; however, the plaintiff must show that 'the adverse action would not have occurred in the absence of the retaliatory motive.'" *D'Andrea v. Nielsen*, 765 F. App'x 602, 605 (2d Cir. 2019). Even under this but-for standard, causation can be proven either: "(1) indirectly, by showing that the protected activity was followed closely by

discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000); *see also Zann Kwan*, 737 F.3d at 845 ("[T]he but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the *prima facie* stage on summary judgment or at trial indirectly through temporal proximity.").

Once Plaintiffs have established a *prima facie* showing of retaliation, the burden then shifts to Defendants to proffer a legitimate, non-retaliatory reason for the adverse employment action. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013). Plaintiff must then demonstrate that the non-retaliatory reason is a mere pretext for retaliation. *Zann Kwan*, 737 F.3d at 845 (2d Cir. 2013).

a. Phase One: *Prima Facie* Case

Defendants argue that Plaintiffs' retaliation claims fail at the causation element and they therefore do not make out a *prima facie* case of retaliation. (Def. Br. at 25-26). Plaintiffs contend, however, that they have made out a *prima facie* case of retaliation based on two theories of causation. (Pl. Br. 14-15).

i. *Indirect Evidence of Causation Applicable to All Retaliation Claims*

First, Plaintiff argues with respect to all three retaliation claims that the record provides sufficient indirect evidence of causation. (Pl. Br. at 14). Specifically, Plaintiffs argue the temporal proximity between their complaints about Russo's purportedly racist comments at the FLC in early March 2018 and their terminations on March 27 and 28, 2018 is sufficient to establish a causal connection. (*Id.*). Defendants do not dispute that the temporal proximity creates an inference of causation, but argue that the causal connection was broken in mid-March by an intervening

event—*i.e.* discovery that Plaintiffs had falsified employee timecards. (Def. Br. at 25). In any event, the Court agrees with Defendants that Plaintiffs' misconduct, discovered during the regular course of an audit by Sobocinski, constitutes an intervening event that broke the causal connection. (56.1 Stmt ¶¶ 28-29); *see, i.e. Dedewo v. CBS Corp.*, No. 18-CV-09132, 2022 WL 1031588, at *7 (S.D.N.Y. Apr. 5, 2022) ("Plaintiff . . . fails to establish a causal connection because her own intervening misconduct severs the chain of causation."); *Rossbach v. Montefiore Med. Ctr.*, No. 19-CV-05758, 2021 WL 930710, at *7 (S.D.N.Y. Mar. 11, 2021) ("Misconduct by a plaintiff qualifies as an intervening event that defeats an inference of retaliation."). Accordingly, temporal proximity does not suffice to establish causation for the purposes of Plaintiffs' *prima facie* retaliation claims.

However, causation may also be proven by circumstantial evidence of disparate treatment of fellow employees who engaged in similar conduct. *Gordon,* 232 F.3d 111, 117 (2d Cir.2000). As discussed *supra*, the record shows a genuine issue of fact exists as to whether Kolibabek was similarly situated to but treated differently than Plaintiffs. Accordingly, causation can be inferred from Plaintiffs' indirect evidence that they were subject to disparate treatment. *See Song v. Potter*, No. 05-CV-08132, 2008 WL 11411483, at *20 (S.D.N.Y. Feb. 13, 2008), *aff'd*, 363 F. App'x 96 (2d Cir. 2010) (finding indirect evidence of disparate treatment sufficient to establish a *prima facie* case of retaliation.) The Court therefore finds Plaintiffs have established a *prima facie* case of retaliation under all three statutes.

ii.    *Cat's Paw Theory of Liability Applicable to Title VII Retaliation*

Secondly, even if evidence of disparate treatment of Plaintiffs were not enough to infer causation, and the Court finds that it is, Plaintiffs additionally argue that they have demonstrated

a *prima facie* claim of retaliation under Title VII based on a cat's paw [8] theory of liability. (Pl. Br. at 15-16). The cat's paw theory is only applicable to Plaintiffs' retaliation claim under Title VII. [9]

Under a "cat's paw" theory of liability, "the unlawful motive of a non-decision maker is imputed to the decision maker, and employer, where the non-decision maker has some significant influence that leads to the adverse employment action." *Vasquez*, 835 F.3d at 272 (2d Cir. 2016). The cat's paw metaphor "refers to a situation in which an employee is fired by a supervisor who himself has no [retaliatory] motive, but who has been manipulated by a subordinate who does have such a motive." *Edwards v. Rochester Inst. Of Tech.*, 794 F. App'x 65, 67 (2d Cir. 2019). A cat's paw theory of liability concerning retaliation is achieved upon a showing that the "employer's own negligence [gave] effect to the employee's animus and cause[d] the victim to suffer an adverse employment action." *Vasquez*, 835 F.3d at 276 (2d Cir. 2016); *see also Chery v. Town of Enfield*, No. 19-CV-1592, 2023 WL 362829, at *7 (D. Conn. Jan. 23, 2023) (citing *Vasquez*, 835 F.3d at 275 (2d Cir. 2016) (a retaliation claim under Title VII is supported when an "employer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision.") (emphasis in original)); *see also Naumovski v. Norris*, 934 F.3d 200, 220 (2d Cir. 2019) ("if an employee 'manipulates an employer into acting as a mere conduit for [her]

---

[8] "The phrase [cat's paw] derives from an Aesop fable, later put into verse by Jean de La Fontaine, in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction; the monkey, however, 'devour[s] . . . them fast,' leaving the cat 'with a burnt paw and no chestnuts' for its trouble." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271-72 (2d Cir. 2016).

[9] Plaintiff has not cited, nor has this Court found, case law establishing that the "cat's paw" theory of liability applies to retaliation claims brought under § 1981 and NYSHRL. *See Natofsky v. City of New York*, 921 F.3d 337, 350 (2d Cir. 2019) ("[n]either the Supreme Court nor this Circuit, however, has addressed whether the [cat's paw] theory would apply to statutes requiring plaintiffs to demonstrate that discriminatory intent was the but-for cause of an adverse employment action").

retaliatory intent,' the employee's intent can be imputed to the employer under a 'negligence' (*i.e.* a 'knew or should have known') standard.").

Plaintiffs essentially argue that Banana Republic was negligent in allowing Russo, an employee with retaliatory intent, to manipulate Borowski, the decision-maker, into terminating Plaintiffs. (Pl. Br. at 16). Defendants respond that Russo played no role in the investigation, nor is there evidence that Banana Republic's investigation of Plaintiffs' misconduct was negligent. (Reply Br. at 7-8).

Here, a reasonable jury could find that Russo was motivated by retaliatory animus to bring about Plaintiffs' terminations. Plaintiffs' complaints about Russo regarding her behavior at the FLC, which Plaintiffs contend were racial in nature, resulted in Russo being investigated by Banana Republic's Human Resources department and issued a Corrective Action less than a month prior to Plaintiffs' terminations. (56.1 Stmt ¶¶ 12-14). In fact, Russo testified that she reached out to Borowski and Schmidt before the investigation started because she "knew that in my position as her supervisor, knowing that [Taylor] had come forward with concerns regarding me, that I did not want her to feel—or there to be, like—feel like there was any type of retaliation for coming with those concerns. So, I knew as a district manager that I did not—I needed to get a partner on, who needs to conduct this investigation, so there's no question about, you know, the merits of the investigation." (Russo Dep. Tr. 245:23-246:10). Despite this, the record in this case includes several pieces of evidence that, when viewed in the light most favorable to Plaintiffs, could lead a reasonable jury to conclude that Banana Republic permitted to Russo to be involved in and have an effect on the investigations and terminations of Plaintiffs. Specifically, Russo fielded a call from Taylor immediately after her second audit failure and reported the failure to Borowski (Russo Dep. Tr. 293:11-294:12; Borowski Decl. ¶ 41; Schmidt Decl. ¶ 58, Ex. PP). Although Russo was not

assigned to the investigatory team, Jean-Louis, a person with whom Russo has a personal relationship, was one of the two designated investigators.[10] (Jean-Louis Dep. Tr. 326:6-8; 56.1 Stmt ¶ 32). Russo was included on multiple calls and email communications regarding the investigatory teams' findings. (56.1 Stmt ¶ 33; Borowski Decl. ¶¶ 44, 46, 48, 50-52). Russo was also present at the Westchester and Vernon Hills Stores when the investigatory team interviewed Plaintiffs regarding their timecard modifications. (56.1 Stmt ¶¶ 43, 55). Kolibabek accused Russo of aggressively questioning her about Taylor during her interview. (Kolibabek Aff. ¶ 11). Russo also participated in the disposition discussions with Jean-Louis, Railey, and Borowski following their interview of each Plaintiff. (56.1 Stmt ¶¶ 43, 55). Notably, Russo then participated in the second interview of Taylor following their disposition discussion. (*Id*. ¶ 51). Russo personally informed both Taylor and Emanuel of their terminations. (*Id*. ¶ 51; Jean-Louis Tr. at 343:6-21).

Accordingly, several factual issues remain about the impact of Russo's participation in the investigations and terminations of Plaintiffs. A question exists as to what, if any, information and/or recommendations Russo provided to Borowski while participating in the team calls and disposition discussions. There is also a dispute over the effect Russo had over the interview process of Plaintiffs and the other employees such as Kolibabek. Further, a question remains as to how much judgment was left to Russo, if any, in deciding to terminate Taylor after hearing Taylor's explanation at that second interview. The extent to which Russo effected the investigatory process and influenced Borowski's termination decisions, if at all, will turn in part on the credibility of Russo, Jean-Louis, Borowski, and Railey. Such credibility determinations are better suited to a jury.

---

[10] Russo testified that Jean-Louis was a groomsman in her wedding and that she had recommended Jean-Louis for his job at Banana Republic. (Russo Dep. Tr. at 366:11-13; 371:8-10).

Drawing all reasonable inferences in Plaintiffs' favor, as is required at this stage, the evidence suggests that Banana Republic permitted Russo to have an effect on the investigations and terminations of Plaintiffs. Because a reasonable jury could also find that Russo was motived by discriminatory animus, the Court finds this evidence is an additional basis for Plaintiffs' *prima facie* case of retaliation under Title VII.

   b.   Phases Two and Three: Legitimate, Non-Discriminatory Reason and Pretext

Regarding phase two, the Court finds that Defendants had a legitimate, nondiscriminatory reason to terminate Plaintiffs, as discussed *supra.*

With respect to phase three, Plaintiffs much show "that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision." *Zann Kwan*, 737 F.3d at 845. "But-for" causation requires only that the adverse action would not have occurred in the absence of a retaliatory motive." *Id.* at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*

The Court has already found that a reasonably jury may find the cat's paw theory of liability applicable and determine that but-for Russo's desire to retaliate and Defendants' involvement of Russo in the investigations and terminations, Plaintiffs would not have been terminated. Additionally, a reasonable jury could infer that the disparate treatment of Kolibabek evidences inconsistencies in Defendants' proffered reason for terminating Plaintiffs. Viewing the evidence in the light most favorable to Plaintiffs, as required on a motion for summary judgment, the

evidence is sufficient to deny Defendants' renewed summary judgment motion as to Plaintiffs' retaliation claims.

Defendants' renewed motion for summary judgment dismissing Plaintiffs' retaliation claims is, therefore, denied.

III.  NYSHRL Aider and Abettor Liability

The final issue for consideration is Plaintiffs' fourth claim for relief—aiding and abetting asserted against Russo, Borowski, and Jean-Louis under the NYSHRL. (FAC ¶¶ 153-57). The operative provision of the NYSHRL provides, in full:

> [i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so.

N.Y. Exec. Law § 296(6). A claim under this provision requires that the "defendant actually participated in the alleged discriminatory acts." *Bonterre v. City of New York*, No. 18-CV-00745, 2021 WL 4060358, at *7 (S.D.N.Y. Sept. 7, 2021) (internal quotation marks omitted); *see also Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) ("To be liable under § 296(6), an individual employee need not have supervisory or hiring and firing power, but must have 'actually participated in the conduct giving rise to the claim.'" (quoting *Feingold*, 366 F.3d at 158)).

Plaintiffs argue that Russo, Borowski, and Jean-Louis participated in the conduct giving rise to Plaintiffs' discrimination and retaliation claims, including their "hand-in-hand involvement" in the investigations and terminations of Plaintiffs. (Pl. Br. at 27). Defendants counter that the aiding and abetting claims against Russo and Jean-Louis must be dismissed because they played no role in the decision to terminate Plaintiffs. (Def. Br. at 27). There is no dispute, however, that Jean-Louis was involved in the investigation and made recommendations

28

based on his findings. (Jean-Louis Dep. Tr. at 353:20-354). Additionally, as discussed *supra*, the Court finds a genuine issue of fact exists as to Russo's level of involvement in the investigations and terminations.

Defendants also argue that the claims of aiding and abetting must be dismissed against all three because they cannot aid and abet their own alleged violation. (Def. Br. at 27-28). However, Plaintiffs correctly point out that this argument runs contrary to Second Circuit law. (Pl. Br. at 28); *see Ahmad v. New York City Health & Hosps. Corp.*, No. 20-CV-0675, 2021 WL 1225875, at *13 (S.D.N.Y. Mar. 31, 2021) ("The Second Circuit has held that a co-worker who actually participates in the conduct giving rise to a discrimination claim [can] be held liable under the NYSHRL . . . even where [an individual defendant's] actions serve as the predicate for the employer's vicarious liability, so long as the employer's conduct has also been found to be discriminatory under the NYSHRL."); *see also Ulrich v. Soft Drink, Brewery Workers & Delivery Emps., Indus. Emps., Warehousemen, Helpers & Miscellaneous Workers, Greater New York & Vicinity, Loc. Union No,*. 812, 425 F. Supp. 3d 234, 244 (S.D.N.Y. 2019).

Accordingly, Defendants' renewed motion for summary judgment is denied with respect to Plaintiffs' aiding and abetting claims against the Individual Defendants.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. The parties are directed to meet and confer and comply with Rules 6(A) and 6(B) of the Court's Individual Practices (rev. June 23, 2023) by filing the documents required therein, which include a joint pretrial order, proposed joint *voir dire* questions, joint requests to charge, joint verdict form, and motions *in limine*, on or before September 13, 2023.

A pretrial conference has been scheduled for October 26, 2023 at 12:00 p.m. to be held in Courtroom 520 of the White Plains courthouse.

The Clerk of Court is respectfully requested to terminate the motion sequence pending at Doc. 178.

Dated: White Plains, New York
      August 14, 2023

**SO ORDERED:**

_____
Philip M. Halpern
United States District Judge